UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BINGHAMTON-JOHNSON CITY JOINT
SEWAGE BD; CITY OF BINGHAMTON;
and VILLAGE OF JOHNSON CITY,

                          Plaintiffs,                    3:12-CV-0553
                                                        (GTS/DEP)

v.

AM. ALTERNATIVE INS. CORP.,

                          Defendant.
_____

APPEARANCES:                             OF COUNSEL:

HINCKLEY, ALLEN & SNYDER, LLP      JAMES J. BARRIERE, ESQ.
  Counsel for Plaintiffs                 NATHAN R. SABOURIN, ESQ.
30 South Pearl Street, Suite 901
Albany, NY 12207

HANNIGAN LAW FIRM PLLC          TERENCE S. HANNIGAN, ESQ.
  Counsel for Defendant
1881 Western Avenue, Suite 140
Albany, NY 12203

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

       Currently before the Court, in this insurance action filed by Binghamton-Johnson City

Joint Sewage Board, the City of Binghamton and the Village of Johnson City ("Johnson City")

("Plaintiffs") against Defendant American Alternative Insurance Corporation ("Defendant"), is

Plaintiffs' motion for partial summary judgment.  (Dkt. No. 13.) For the reasons set forth below,

Plaintiffs' motion is denied.

## I.    RELEVANT BACKGROUND

### A.    Plaintiffs' Complaint

Generally, in their Complaint, Plaintiffs assert claims for declaratory judgment and breach of contract, in an attempt to recover, under a property damage and general liability insurance policy provided by Defendant, $3,555,993.94 in costs resulting from a structural wall collapse at the Binghamton-Johnson City Joint Sewage Treatment Plant on May 16, 2011.  (Dkt. No. 1 [Plfs.' Compl.].)

### B.    Parties' Briefing on Plaintiffs' Motion

#### 1.    Plaintiffs' Memorandum of Law in Chief

Generally, in their memorandum of law in chief, Plaintiffs assert two arguments.   (Dkt. No. 13, Attach. 1 [Plfs.' Memo. of Law in Chief].)

First, argue Plaintiffs, they are entitled to a judgment for the replacement cost of the media and gravel lost due to the wall collapse, because it is undisputed that (a) a valid policy was in place during the time in question, Plaintiffs were insureds under the Policy, the media and gravel lost from C-Cells 2-4 constitute a covered personal property loss under the express terms of the Policy, and the amount paid by Defendant in connection with the loss (in an untimely manner) does not entirely compensate Plaintiffs for the cost of the Biolite L.2.7mm filter media and gravel that was lost due to the wall collapse, and (b) the Haydite media and gravel contemplated by AAIC (in its payment) is not of the same "kind and quality" (i.e., the same type, grade, or class of material) as the Biolite L.2.7mm filter media and gravel that was lost due to the wall collapse.  (*Id*. at 13-16 [attaching pages "9" through "12" of Plfs.' Memo. of Law in Chief].)

Second, argue Plaintiffs, statutory pre-judgment interest in the amount of nine percent

(9%) per year should be assessed on Plaintiffs' breach-of-contract claim from the earliest

ascertainable date on which that claim existed (i.e., November 9, 2011, or thirty days from of

their submission of their sworn statement of loss), pursuant to N.Y. C.P.L.R. §§ 5001, 5002,

5004.  (*Id*. at 17-18 [attaching pages "13" and "14" of Plfs.' Memo. of Law in Chief].)

## 2. Defendant's Opposition Memorandum of Law

Generally, in its opposition memorandum of law, Defendant asserts three arguments.

(Dkt. No. 16 [Def.'s Opp'n Memo. of Law].)

First, argues Defendant, Plaintiffs' motion should be denied because they failed to

comply with Section V(6)(a)(5) of the Policy by listing, in their Proof of Loss, the imported

"Biolite L.2.7mm" filter media that they now seek, or the cost of those items, nor did they object

to the cost of the media and gravel that was calculated by Defendant following their Proof of

Loss, thus rendering their current request, at best, premature (and a complete surprise to

Defendant).  (*Id*. at 3-5 [attaching pages "1" through "3" of Def.'s Opp'n Memo. of Law].)

Second, argues Defendant, in the alternative, at a minimum, issues of fact exist as to the

specific type and cost of replacement media required under the policy, because the Affidavit of

Ned Paschke raises genuine disputes of material fact regarding (a) whether the only suitable

replacement media must be obtained from Norway (given industry advancements and the more

recent availability of that media from United States-based sources since the time of the subject

reconstruction project), and (b) whether the Haydite media analyzed by him (and essentially

provided by Defendant) is of the same "kind and quality" as the media contained in the Plant at

the time of the May 2011 wall collapse (which dispute can be resolved only through an

affirmative directive or letter of the process manufacturer, Infilco Degremont, Inc., and not merely through the affidavit of Hussien Elzoghby, which reflects his opinion as the engineer and not the opinion of the manufacturer).  (*Id*. at 6 [attaching page "4" of Def.'s Opp'n Memo. of Law].)

Third, argues Defendant, in the alternative, Plaintiffs' claim for statutory interest from November 9, 2011, is improper, because Defendant was never placed on notice that its calculations were in error (particularly given its analysis and response to the Proof of Loss documents submitted by Plaintiffs).  (*Id*. at 5 [attaching page "3" of Def.'s Opp'n Memo. of Law].)

### 3.    Plaintiffs' Reply Memorandum of Law

Generally, in their reply memorandum of law, Plaintiffs assert four arguments.  (Dkt. No. 22 [Plfs.' Reply Memo. of Law].)

First, argue Plaintiffs, the Court should deem the entirety of the factual assertions contained their Local Rule 7.1 Statement admitted for the purposes of their motion, because Defendant has failed to comply with Local Rule 7.1(a)(3) by failing to cite specific record citations in support of several denials of fact, and asserting several inappropriate legal arguments.  (*Id*. at 4-7 [attaching pages "1" through "4" of Plfs.' Reply Memo. of Law].)

Second, argue Plaintiffs, they complied with the Policy, because (a) only substantial and not strict compliance is required of the Policy, which is to be liberally construed in favor of Plaintiffs, (b) where there has been no request for more information by Defendant, the Policy required merely "a description of the property involved" and not a "list" or "itemization" of the claims and costs that Plaintiffs seek in the current action, (c) Defendant had at least constructive

notice that Plaintiffs needed, and were seeking recovery of, the Biolite media, and that Plaintiffs were accepting Defendant's payment of "283,572.75" with a "full reservation of rights" (and in any event Defendant could have confirmed that fact through discovery, which it failed to conduct). (*Id*. at 7-10 [attaching pages "4" through "7" of Plfs.' Reply Memo. of Law].)

Third, argue Plaintiffs, there is no dispute as to the type and cost of replacement media under the Policy, because (a) there is no dispute that the party responsible for the ultimate determination of what type of replacement media material should be utilized is Plaintiffs' process engineer, IDI, and (b) Defendant's witness, Ned Paschke, has not been disclosed as an expert, and in any event he does not opine that Haydite media material is of the "same kind and quality" as Biolite L.2.7. mm. (*Id*. at 11-13 [attaching pages "8" through "10" of Plfs.' Reply Memo. of Law].)

Fourth, argue Plaintiffs, their breach-of-contract claim accrued on November 9, 2011, because Defendant has failed to adduce any factual or legal support for its argument to the contrary. (*Id*. at 10-11 [attaching pages "7" and "8" of Plfs.' Reply Memo. of Law].)

**C.     Statement of Undisputed Material Facts**

Unless otherwise followed by citations to the record, the following material facts have been asserted and supported by Plaintiffs' in their Local Rule 7.1 Statement of Undisputed Material Facts, and either admitted or denied without a supporting record citation by Defendant in its Local Rule 7.1 Response. (*Compare* Dkt. No. 13, Attach. 2 [Plfs.' Rule 7.1 Statement] *with* Dkt. No. 15 [Def.'s Rule 7.1 Response].)

1.      Plaintiff B-JC is a public board that is comprised of members appointed by the Plaintiff Binghamton, a New York municipal corporation located in Broome County, New York,

and the Plaintiff Johnson City, a New York municipal corporation located in Broome County, New York.

2.      Plaintiff B-JC operates and maintains the Binghamton-Johnson City Joint Sewage Treatment Plant ("Plant") located at 4480 Vestal Road, Vestal, New York.

The Project

3.      In 2001, pursuant to a Consent Order issued by the New York State Department of Environmental Conservation ("NYS DEC"), Plaintiffs began reconstruction of the Plant to expand its wastewater treatment facilities to meet effluent quality requirements for the discharge of treated waste water into the Susquehanna River and Chesapeake Bay Watershed and to increase the plant's secondary treatment capacity to a peak discharge rate for finished effluent of sixty million gallons per day ("mgd") during peak demand and storm water flows in the region (the "Project").

4.      As part of the Project, Plaintiffs procured a biological aerated filter ("BAF") system to replace an existing activated sludge secondary treatment process. The work included the demolition of existing plant facilities, the construction of a 70 mgd BAF influent pump station and mechanical systems, the construction of reinforced concrete facilities and masonry buildings to house the BAF system, the conversion of four secondary clarifiers to primary clarifiers, new controls and monitoring systems, new electrical service to the filter complex, new primary sludge pumps and additional chlorination tanks.

5.      Pursuant to the specifications provided by the BAF system designer and supplier, Infilco Degremont, Inc. f/k/a Ondeo Degremont, Inc. ("IDI"), Plaintiffs and their contractors were required to procure two types of media material for the system–Biolite L.2.7mm for the

Plant's aerated carbonaceous filter cells ("C-Cells") and nitrification filter cells ("N-Cells"), and

Biolite P.4.6mm for the Plant's anoxic denitrification filter cells ("DN-Cells").[1]

6.     The Biolite media material is an expanded shale/clay material with a high specific

area, low density, and high resistance to attrition. It is specifically designed and developed for

use in treating wastewater, and was a crucial component of the Biofor process installed at the

Plant.

7.     The specified Biolite media for the Plant–7,969 cubic meters ("m³") for the C-

and N-Cells and 1,023 m³ for the DN-Cells–was sourced and procured by Plaintiffs and their

contractors from Norway at a cost of $2,334,935.61.[2]

8.     The Biolite media for the Plant's C-Cells–Biolite L.2.7 mm–was installed

between September 25, 2006, and October 16, 2006.

9.     In addition to the Biolite media, IDI's specifications for the BAF filters required

the installation of 12" of gravel underneath the Biolite media for each filter cell.

---

[1]     While Defendant questions whether the type of media was required or merely recommended, it cites no admissible record evidence establishing that the media was merely recommended.  (Dkt. No. 15, at ¶ 5 [Def.'s Rule 7.1 Response].)

[2]     In denying this fact, Defendant denies information or knowledge of the fact and challenges the veracity of the affidavit cited by Plaintiffs.  However, a non-movant cannot create a genuine dispute of material fact by merely denying knowledge of that fact. *See, e.g., U.S. v. 15 Black Ledge Drive*, 897 F.2d 97, 102 (2d Cir.1990); *Lenigan v. Syracuse Hancock Intern. Airport*, 10-CV-1420, 2013 WL 149461, at *6, n.6 (N.D.N.Y. Jan. 14, 2013) (Suddaby, J.); *Brill v. Prudential-Bache Sec., Inc.*, 84-CV-0846, 1985 WL 8037, at *3 (S.D.N.Y. July 29, 1985). Furthermore, a non-movant cannot create a genuine dispute of material fact by merely challenging the veracity of the movant's affidavit.  *See Cusamano v. Sobek*, 604 F. Supp.2d 416, 496 (N.D.N.Y. 2009) (Lowe, M.J., adopted by Suddaby, J.); *Torres v. Caron*, 08-CV-0416, 2009 WL 5216956, at *2. n.8 (N.D.N.Y. 2009) (Lowe, M.J., adopted by Mordue, C.J.); *Chem. Bank v. Hartford Acc. & Indem. Co.*, 82 F.R.D. 376, 378 (S.D.N.Y.1979).

10.     The 12" gravel was procured by Plaintiffs and their contractors at a cost of $95,934.85.

11.     The 12" gravel underlay for the Plant's C-Cells was installed in said cells between August 30, 2006, and September 7, 2006.

12.     Plaintiffs incurred approximately $2,430,870.46 in expenses for the installation of the Biolite filter media and gravel into the Plant's C-Cells.

### Catastrophic Structural Wall Collapse

13.     On May 16, 2011, a fifteen (15) foot high, one-hundred-foot long portion of the exterior wall on the western side of the Plant collapsed.

14.     The collapsed wall had been constructed to enclose cells 1-4 of the C-Cell filter section of the Plant.

15.     As a result of the collapse, approximately 580,000 gallons of partially treated wastewater and Biolite L.2.7mm filter media poured out of the cells, into a nearby creek and onto an adjacent New York State Electric and Gas Utility ("NYSEG") parking lot, causing property damage and an environmental hazard.

16.     During this event, a majority of the contents of C-Cells 2-4 were emptied and lost, with the remaining portion ultimately deemed unusable.

17.     At the time of the collapse, C-Cells 2-4 contained approximately 1,697.58 cubic yards ("yd$^3$") of Biolite L.2.7mm filter media.

18.     At the time of the collapse, C-Cells 2-4 contained approximately 154.32 yd$^3$ of gravel.

<u>The Policy</u>

19.     Plaintiffs purchased Insurance Policy number SDISSP 9154666-0/0 (the "Policy"), for the period from January 1, 2011, to January 1, 2012, from Defendant American Alternative Insurance Corporation ("AAIC" or "Defendant").

20.     The Policy provides $90,867,404 blanket liability property damage, pollution remediation expenses of $25,000 for a covered cause of loss and of $100,000 for a specified cause of loss, as well as a general aggregate liability coverage of $3,000,000.

21.     Plaintiff B-JC's deductible under the Policy was $5,000.00 per occurrence.

22.     The property damage provisions of the Policy covers direct physical loss or damage to "real property" and "personal property" at a "premises" caused by or resulting from any "covered cause of loss," together with expenses for pollution remediation expenses.

23.     Pursuant to the Policy's Declarations, the valuation of the limit of insurance is based upon "replacement cost."

24.     The Policy states that, if "replacement cost" is indicated in the Declarations, AAIC "will pay the 'replacement cost' of any loss or damage to 'real property' or 'personal property,' less any deductible that applies."

25.     The Policy states that, if "replacement cost" is indicated in the Declarations, AAIC will pay the replacement cost so long as "[t]he repairs to or replacement of the 'real property' or 'personal property' are of the same kind and quality and at the same 'premises' as the 'real property' or 'personal property' suffering the loss or damage . . . ."

26.     Damage to personal property at the premises is addressed in the Policy as follows:

**Coverage B. "Personal Property"**
We will pay for direct physical loss or damage to "personal property" at a "premises" caused by or resulting from any "covered cause of loss". The most we will pay is described under SECTION IV. WHAT WE WILL PAY.

27.     Pursuant to the Policy, covered causes of loss are as follows:

**SECTION III. COVERED CAUSES OF LOSS**
"Covered cause of loss" means any risk of direct physical loss or damage except as excluded or limited below.

28.     Pursuant to the Policy, certain exclusions apply, but none of these

exclusions are applicable to Plaintiffs' claim for cost to replace the Biolite media lost

from C-Filter Cells Nos. 2-4.

29.     The Policy's definitions are set forth in Section VI and provide, in

relevant part, as follows:

5.      "Covered cause of loss" is defined in SECTION III. COVERED CAUSES OF LOSS.
. . . .
23.     "Personal property" means all property used in your "operations", other than "real property", including but not limited to furnishings and equipment, building contents, "computer equipment" or communication systems, provided the property is on your "premises" and also provided you own the property or the property is in your custody or control, and you are responsible for it, even though it belongs to someone else.
. . . .
29.     "Replacement costs" is the amount it would take, following direct physical loss or damage, to replace property with property of the same kind and quality, determined at the time of loss, without deduction for deterioration, depreciation or obsolescence.
. . . .
33.     "Specified cause of loss" means fire, lightning, windstorm or hail, explosion, riot or civil commotion, "vehicles" or aircraft, smoke, sonic boom, vandalism and malicious mischief, "sprinkler leakage", sinkhole collapse", volcanic action", failing objects, weight of ice, snow or sleet, or water damage. Water damage means only accidental discharge or leakage of water or steam as

the direct result of the breaking or cracking of any part of a system or appliance containing water or steam. "Specified cause of loss" does not include "remediation expenses" resulting from the spilling or dripping of gasoline, diesel fuel or other pollutants while being delivered by "vehicles" into storage tanks or other repositories, and/or when "vehicles" are being fueled.

30.     Pursuant to the Policy, AAIC is required to make payment for covered loss or damage within thirty (30) days after it receives the sworn proof of loss.

## The Loss and Claim

31.     As a result of the wall collapse, the Plant suffered significant losses covered under the Policy. [3]

32.     Plaintiffs gave immediate Loss Notice to AAIC of their damage and losses from the May 16, 2011, wall collapse.

33.     On May 17, 2011, inspectors from AAIC inspected the site and resulting damage of the wall collapse.

34.     By letter dated May 20, 2011, AAIC, through its Claim Manager Glatfelter Claims Management, Inc. ("GCM"), provided a preliminary analysis of its insurance coverages.

35.     On July 22, 2011, AAIC, through GCM, sent a declination of coverage.

36.     On October 10, 2011, Plaintiffs submitted to GCM their October 3, 2011, Proof of Loss. (Dkt. No. 13, Attach. 3, at 5 [Aingworth Affid.]; Dkt. No. 13, Attach. 16 [Ex. M to Aingworth Affid.]; *cf.* Dkt. No. 6, at ¶ 7 [Def.'s Answer, asserting "Defendant received a Proof

---

[3]     After expressly admitting this fact, Defendant asserted another fact followed by a citation to "Exhibit A" to the Aingworth Affidavit. (Dkt. No. 15, at ¶ 31 [Def.'s Rule 7.1 Response].) To the extent Defendant is attempting to assert an additional material fact that is dispute, the place for that assertion is in a "separately numbered paragraph[]." N.D.N.Y. L.R. 7.1(a)(3). In any event, the citation Defendant provides is not "specific," because "Exhibit A" is 58 pages in length. *Id.* (*See also* Dkt. No. 13, Attach. 4 [Ex. A to Aingworth Affid.].)

of Loss from Plaintiffs"].)[4]

37. On December 29, 2011, AAIC, through GCM, acknowledged that certain costs incurred by Plaintiffs to collect, load and haul the damaged Biolite L.2.7mm filter media from the Plant to the Broome County Landfill were covered losses under the Policy.

38. Plaintiffs accepted AAIC's payment of $25,067.78 for the costs incurred to collect, load and haul the damaged Biolite L.2.7mm filter media from the Plant to the Broome County Landfill, with a full reservation of rights.

39. As part of AAIC's payment of $25,067.78, it deducted Plaintiffs' deductible of $5,000.00.

40. On January 18, 2012, AAIC, through GCM, acknowledged that the replacement costs to purchase and install the media and gravel for C-Cells 2-4, and the associated professional engineering and oversight expenses, were covered losses under the Policy.

41. Plaintiffs received AAIC's payment of $283,572.75 for the estimated replacement costs to install the filter media and gravel for C-Cells 2-4, and endorsed the check with the statement "Endorsed with full Reservation of Rights." (Dkt. No. 13, Attach. 3, at ¶ 32

---

[4] In denying this fact, Defendant asserts that the Proof of Loss failed to comply with Paragraph (a)(5) of Condition 6 of Section V of the Policy, which requires that "[a]t [Defendant's] request, [Plaintiffs must] complete inventories of the damaged and undamaged property . . . [i]nclud[ing] quantifies, costs, values, and amount of loss claimed." (Dkt. No. 15, at ¶ 31 [Def.'s Rule 7.1 Response]; Dkt. No. 13, Attach. 4, at 43 [Ex. A to Aingworth Affid.].) Specifically, Defendant asserts that the Proof of Loss "never . . . specified a dollar value of the media [that were to be replaced]." (Dkt. No. 15, at ¶ 31 [Def.'s Rule 7.1 Response].) Setting aside the fact that Plaintiffs' factual assertion never specifically stated that their Proof of Loss was in compliance with Paragraph (a)(5) of Condition 6 of Section V of the Policy, Defendant did not in its denial assert (or cite a specific portion of the record establishing) that it had previously *requested* that a "complete inventor[y] of the damaged . . . property" (including the dollar value of the media to be replaced).

[Aingworth Affid.]; Dkt. No. 13, Attach. 21 [Ex . R to Aingworth Affid.].)[5]

42.     AAIC's letter to Plaintiffs dated January 18, 2012, which transmitted its check for
$283,572.75, included a report by Ned Paschke, dated January 7, 2012, which contained the
methodology as to how AAIC calculated the media yardage and cost as well as an abstract of
costs and invoices considered.  (Dkt. No. 15, Attach. 1 [Ex. A to Def.'s Rule 7.1 Response].)
However, Paschke's report did not set forth the costs to procure and install the *particular* filter
media (i.e., Biolite L.2.7mm) and gravel that was present in C-Cells 2-4 at the time of the wall
collapse on May 16, 2011.  (*Compare* Dkt. No. 13, Attach. 5 [Ex. B to Aingworth Affid.,
containing quotation from "Haydite Media"] *with* Dkt. No. 13, Attach. 3, at ¶¶ 8-14, 30
[Aingworth Affid.] *and* Dkt. No. 15, Attach. 1 [Ex. A to Def.'s Rule 7.1 Response] *and* Dkt. No.
13, Attach. 25, at ¶¶ 4-6, 8-11 [Elzoghby Affid.] *and* Dkt. No. 13, Attach. 26-28 [Exs. A-C to
Elzoghby Affid.].)

43.     In its letter to Plaintiffs dated January 18, 2012 (which referenced and attached
Paschke's report), AAIC did not dispute that the Policy covers the costs to be incurred by
Plaintiffs to replace the material lost from C-Cells 2-4 (as a result of the wall collapse on May
16, 2011) with material of the same kind and quality.  (Dkt. No. 13, Attach. 19-20 [Exs. P and Q
to Aingworth Affid.].)

_____

[5]     It is difficult for the Court to understand how Defendant could admit that the
reservation of rights upon acceptance of the check for $25,067.78 was effective (Dkt. No. 15, at
¶ 38), but deny that the reservation of rights upon acceptance of the check for $283,572.75 (*id*. at
¶ 41) was effective, where the methods used to reserve rights were identical (*compare* Dkt. No.
13, Attach. 18, at 3 *with* Dkt. No. 13, Attach. 21, at 3).  However, the Court has carefully
articulated this fact, so as to account for the thrust of Defendant's objection.

44.     The terms of the Policy by which coverage is provided have never been modified or amended.

<u>Costs for Replacement of Media, Gravel, and Associated Labor and Fees</u>

45.     IDI, the entity that will be supplying the BAF system equipment and materials, and Biofor materials for C-Cell reconstruction, has stated that the media that will be purchased and installed into the reconstructed C-Cells is Biolite L.2.7.  (Dkt. No. 13, Attach. 25, at ¶¶ 9-11 [Elzoghby Aff.].)

46.     The cost to purchase 1,697.58 yd³ of Biolite L.2.7mm filter media (to replace the media lost from C-Cells 2-4 as a result of the wall collapse on May 16, 2011) is $942,156.90. (Dkt. No. 13, Attach. 25, at ¶ 13 [Elzoghby Aff.].)

47.     The cost to purchase 154.32 yd³ of gravel (to replace the gravel lost from C-Cells 2-4 as a result of the wall collapse on May 16, 2011) is $9,259.20.  (*Id*.)

48.     The cost to install the referenced 1,697.58 yd³ of Biolite L.2.7mm filter media is $84,879.00.  (*Id*.)

49.     The cost for the professional engineering and oversight associated with the purchase and installation of the referenced 1,697.58 yd³ of Biolite L.2.7mm filter media and 154.32 yd³ of gravel is $155,444.27.  (*Id*. at ¶ 14).

50.     The total cost for the purchase and installation of the 1,697.58 yd³ of Biolite L.2.7mm filter media and 154.32 yd³ of gravel needed to replace what was lost from C-Cells 2–4 as a result of the wall collapse on May 16, 2011, is $1,191,739.37.  (*Id*. at ¶¶ 13-16.)

51.     Of this total cost of $1,191,739.37, Defendant has remitted payment for $283,572.75, leaving a difference of $908,166.62.  (Dkt. No. 13, Attach. 3, at ¶ 32 [Aingworth Affid.]; Dkt. No. 13, Attach. 25, at ¶ 16 [Elzoghby Aff.].)

## II. GOVERNING LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson*, 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that nonmoving party is proceeding *pro se*.[6] (This is because the Court extends special solicitude to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[7] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[8]

Of course, when a non-movant has failed to respond to a movant's motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the movant's motion does is lighten the movant's burden on its motion.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to be admitted, to the extent that those facts are supported by

---

[6]      *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[7]      *Cusamano*, 604 F. Supp.2d at 426 & n.3 (citing cases).

[8]      *Cusamano*, 604 F. Supp.2d at 426-27 & n.4 (citing cases).

evidence in the record, where the nonmoving party has willfully failed to properly respond to that statement.[9]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[10]  Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden.  *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

---

[9]       Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

[10]       *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

## III. ANALYSIS

After carefully considering the matter, the Court denies Plaintiffs' motion for the reasons stated in Defendant's opposition memorandum of law. *See, supra,* Part I.B.2. of this Decision and Order. To those reasons, the Court would add only four points.

First, while Plaintiffs' argument regarding Defendant's Rule 7.1 Response is well taken, that argument does not warrant the judgment they request (or even the deeming of *all* of the factual assertions contained in Plaintiffs' Rule 7.1 Statement as admitted). As pointed out above in Part II of this Decision and Order, before a fact may be deemed admitted by a non-movant, the movant must meet his modest threshold burden with regard to that fact. Moreover, during its review of the record to determine if a movant has met his modest threshold burden, the Court will not turn a blind eye to a genuine dispute of material fact, should it discover one. *Gantt v. Mielenz*, 10-CV-0083, 2012 WL 4033723, at *3 & n.12 (N.D.N.Y. Sept. 12, 2012) (Suddaby, J.); *Burgess v. County of Rensselaer*, 03-CV-0652, 2006 WL 3729750, at *1 (N.D.N.Y. Dec. 18, 2006) (McCurn, J.). Moreover, while the majority of Defendant's denials were defective, not all the denials were totally defective. Even if they were all defective, they would not require judgment in Plaintiffs' favor, because they omitted two key facts (which are discussed below).

Second, based on the current record, the Court finds at least one genuine dispute of material fact: whether Plaintiffs' Proof of Loss was in substantial compliance with the terms of the Policy. An implicit if not explicit part of the argument asserted by Plaintiffs for why they are entitled to judgment as a matter of law is that they upheld their end of the bargain by dutifully filing a Proof Loss, and Defendant failed to uphold its end of the bargain thereafter. (*See, e.g.,* Dkt. No. 13, Attach. 2, at ¶ 36 [Plfs.' Rule 7.1 Statement, asserting that Plaintiffs' filed a Proof

of Loss on October 10, 2011]; Dkt. No. 13, Attach. 4, at 43 [Ex. A to Aingworth Affid., attaching Section V[6][a][5] of the Policy]; Dkt. No. 13, Attach. 1, at 15 [attaching page "11" of Plfs.' Memo. of Law in Chief, arguing that Plaintiffs' filing of the Proof of Loss triggered Defendant's duty to pay them within 30 days].) However, the relevant sections of the Policy put before the Court by Plaintiffs required them to merely "[i]nclude a description of the property involved"–*unless Defendant requested otherwise*. (Dkt. No. 13, Attach. 4, at 42-43 [emphasis added].) Specifically, "[a]t [Defendant's] request," Plaintiffs had to provide a "complete inventor[y] of the damaged . . . property . . . [i]nclud[ing] [the] costs . . . and amount of loss claimed." (*Id*. at 43.) Granted, in its *sua sponte* review of the record, the Court could not with confidence identify, in Defendant's letters to Plaintiffs, a request for the dollar value of the media to be replaced. (Dkt. No. 13, Attach. 12; Dkt. No. 13, Attach. 14; Dkt. No. 13, Attach. 17; Dkt. No. 13, Attach. 20.) However, setting aside the possibility that such a request was communicated by email message or orally, it is Plaintiffs' duty (as movants) to show that it is undisputed that no such request was made, given the language of Policy relied on by Plaintiffs. Their papers are conspicuously absent of such an effort.

Third, even if the Court were incorrect in shouldering Plaintiffs with the duty referenced in the prior paragraph, an alternative reason exists to deny their motion: the Court finds that a genuine dispute of material fact also exists regarding whether the Haydite and gravel essentially provided by Defendant are media materials of the "same kind and quality" as the Biolite L.2.7 mm media material and the gravel originally used. On the one hand, the record contains the affidavit of Plaintiffs' witness, Hussien Elzoghby, recommending against the use of the Haydite media, but acknowledging that he lacks knowledge of whether Haydite has been identified

19

and/or approved by IDI (the process manufacturer).  (Dkt. No. 13, Attach. 25, at ¶ 18.)  On the other hand, the record contains the affidavit of Defendant's witness, Ned Paschke, characterizing Haydite as a "domestically supplied . . . Biolite material," which he understands may be acceptable to IDI.  (Dkt. No. 18, at ¶¶ 5-7.)[11]  Missing from the record is an affirmative directive or letter of IDI.  For the sake of brevity, the Court will not linger on whether such a directive or letter would in all cases resolve all dispute regarding this issue (i.e., even if it were accompanied by an indication that IDI possessed a financial interest in the sale of Biolite or lacked material up-to-date information).  More important is that, again, it is Plaintiffs' duty (as movants) to show that it is undisputed that Haydite is not a media material of the same kind and quality as Biolite L.2.7 mm media material (which is the main basis for their argument that Defendant breached the Policy); and, again, their papers fail to make such a showing.

Fourth, in light of the relatively discrete nature of the factual issues remaining for trial (and the fact that the dispositive-motion-filing deadline has been extended to September 23, 2014), the Court finds it appropriate to require counsel to appear in Chambers for a conference, during which the Court will discuss (1) the above-referenced factual issues, (2) whether to grant Plaintiffs leave to renew their current motion for summary judgment (upon a supplemental evidentiary record), and (3) the prospect of settlement.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' motion for partial summary judgment (Dkt. No. 13) is **<u>DENIED</u>**; and it is further

---

[11]     While Plaintiffs argue that Mr. Paschke has not been properly disclosed as an expert, they do not adduce record evidence in support of that argument, nor do they formally move to strike his affidavit on that ground.

**ORDERED** that counsel are directed to appear on **OCTOBER 30, 2014**  at 11:00 a.m. in

chambers for a pretrial conference, at which counsel are directed to appear with settlement

authority, and in the event that the case does not settle, trial will be scheduled at that time.

Plaintiff is further directed to forward a written settlement demand to defendants no later than

**OCTOBER 9, 2014**, and the parties are directed to engage in meaningful settlement

negotiations prior to the conference.

Dated: September 22, 2014
       Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge