UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BINGHAMTON-JOHNSON CITY JOINT SEWAGE
BD; CITY OF BINGHAMTON; and VILLAGE OF
JOHNSON CITY,

                          Plaintiffs,                    3:12-CV-0553
                                                  (GTS/DEP)
v.

AM. ALTERNATIVE INS. CORP.,

                          Defendant.
_____

| APPEARANCES: | OF COUNSEL: |
| --- | --- |
| HINCKLEY, ALLEN & SNYDER, LLP | ERIC F. EISENBERG, ESQ. |
|   Counsel for Plaintiffs | JAMES J. BARRIERE, ESQ. |
| 30 South Pearl Street, Suite 901 | NATHAN R. SABOURIN, ESQ. |
| Albany, NY 12207 | |
| | |
| HANNIGAN LAW FIRM PLLC | TERENCE S. HANNIGAN, ESQ. |
|   Counsel for Defendant | |
| 1881 Western Avenue, Suite 140 | |
| Albany, NY 12203 | |

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this insurance action filed by Binghamton-Johnson City

Joint Sewage Board, the City of Binghamton and the Village of Johnson City ("Johnson City")

("Plaintiffs") against Defendant American Alternative Insurance Corporation ("Defendant"), are

Plaintiffs' motion for summary judgment and Defendant's motion for summary judgment. (Dkt.

Nos. 47, 49.) For the reasons set forth below, Plaintiffs' motion is denied, and Defendant's

motion is denied.

## <u>TABLE OF CONTENTS</u>

I.   RELEVANT BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     A.   Plaintiffs' Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     B.   Parties' Briefing on Plaintiffs' Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
          1.   Plaintiffs' Memorandum of Law  . . . . . . . . . . . . . . . . . . . . . . . . . 3
          2.   Defendant's Opposition Memorandum of Law  . . . . . . . . . . . . . . . . 4
          3.   Plaintiffs' Reply Memorandum of Law . . . . . . . . . . . . . . . . . . . . . . 7
     C.   Parties' Briefing on Defendant's Motion . . . . . . . . . . . . . . . . . . . . . . . . . 8
          1.   Defendant's Memorandum of Law  . . . . . . . . . . . . . . . . . . . . . . . . 8
          2.   Plaintiffs' Opposition Memorandum of Law  . . . . . . . . . . . . . . . . 10
          3.   Defendant's Reply Memorandum of Law . . . . . . . . . . . . . . . . . . . 11
     D.   Statements of Undisputed Material Facts . . . . . . . . . . . . . . . . . . . . . . . 11
          1.   Undisputed Facts Material to Plaintiffs' Motion  . . . . . . . . . . . . . 11
          2.   Undisputed Facts Material to Defendant's Motion  . . . . . . . . . . . . 20
II.  GOVERNING LEGAL STANDARD  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
III. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
     A.   Plaintiffs' Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
     B.   Defendant's Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

# I.    RELEVANT BACKGROUND

## A.    Plaintiffs' Complaint

Generally, in their Complaint, Plaintiffs assert claims for declaratory judgment and breach of contract, in an attempt to recover, under a property damage and general liability insurance policy provided by Defendant, $3,555,993.94 in costs resulting from a structural wall collapse at the Binghamton-Johnson City Joint Sewage Treatment Plant on May 16, 2011.  (Dkt. No. 1 [Plfs.' Compl.].)

## B.    Parties' Briefing on Plaintiffs' Motion

### 1.    Plaintiffs' Memorandum of Law

Generally, in their motion for summary judgment, Plaintiffs assert two arguments.  (Dkt. No. 47, Attach. 1 [Plfs.' Memo. of Law].)

First, Plaintiffs argue, they are entitled to a declaratory judgment stating that Defendant is obligated under the Policy to pay their losses and damages for the following reasons: (a) under an "all risk" insurance policy (such as the one in this case), losses caused by any fortuitous peril not specifically excluded under the policy will be covered; (b) when relying on an exclusion, the burden is on the insurer to show by a preponderance of the evidence that the exclusion applies; (c) more specifically, to show that an exclusion applies, the insurer must demonstrate that an interpretation favoring the insurer is the only reasonable reading of at least one of the relevant terms of exclusion; (d) here, Plaintiffs have met their initial burden of showing that a valid policy was in place at the time of the wall collapse, that they are insureds under the Policy, that the losses and damages suffered by them were to covered real and personal property, and that they satisfied their post-event-of-loss obligations by promptly notifying Defendant of the wall

collapse, cooperating with Defendant's investigation, and providing Defendant with a sworn Proof of Loss statement; (e) as a result, the burden is shifted to Defendant to establish, by a preponderance of the evidence, that its denial of coverage based upon the Faulty Design and Workmanship Exclusion is the "only reasonable reading" of that exclusion; (f) Defendant has not met that burden because the losses and damages sought under the Policy (i.e., the repair and replacement of physical and process components and/or equipment of the C-Cell Complex and the contents therein) did not result from faulty design, workmanship and/or material, but rather from the collapse of the west wall of the covered personal property (the C-Cell Filter and BAF Complex); (g) moreover, the Faulty Design and Workmanship Exclusion goes on to state, "But [Defendant] will cover loss or damage that results from any of these if the loss or damage occurs in connection with any cause of loss not otherwise excluded by this coverage part" (the "Resulting Loss Exception"); and (h) to show that Plaintiffs' loss or damage has *not* occurred in "connection with [such a] cause of loss," Defendant would need expert testimony, but it has disclosed no such expert. (*Id.*)

Second, Plaintiffs argue, Defendant is estopped from arguing that damages resulting from the wall collapse are not covered under the Policy, because (a) by paying a portion of the cost of replacing the lost media, Defendant acknowledged that the Resulting Loss Exception to the Faulty Design and Workmanship Exclusion applies to the lost media, and (b) there is no meaningful distinction that can be drawn between the wall collapse and the loss of media. (*Id.*)

### 2.     Defendant's Opposition Memorandum of Law

Generally, in its response to Plaintiffs' motion, Defendant asserts two arguments. (Dkt. No. 56 [Def.'s Opp'n Memo. of Law].)

First, Defendant argues, Plaintiffs' contention that the Resulting Loss Exception to the Faulty Design and Workmanship Exclusion applies to the wall collapse is without merit for the following reasons: (a) the exclusion specifically excludes losses and damages "directly *or indirectly*" related to defects in design and workmanship; (b) Plaintiffs do not dispute that the failure of the C-Cells was the result of defects in design and workmanship that preexisted the failure (as is evident from the record); (c) Plaintiffs seek to usurp the Court's role in interpreting insurance policies by improperly relying on the self-proclaimed "expert in insurance policy interpretation" Paul Nielander, whose faulty logic and reliance on insurance practice in other states (as well as what words other insurance policies contain) renders him unqualified and his opinion irrelevant to this action under *Daubert v. Merrell Dow Pharm.* and *Kumho Tire Co. v. Carmichael*; (d) Plaintiffs interpret the Resulting Loss Exception in a way that impermissibly renders the exception greater than the exclusion itself; (e) moreover, in arguing that the "collapse" of the wall is a covered cause of loss (or, alternatively, that the Policy does not contain an exclusion for a "collapse"), Plaintiffs ignore that the collapse of the wall was the direct result of design and workmanship defects, and not some independent cause (as is evident from record); (f) in effect, Plaintiffs are attempting to treat the inevitable "collapse" of a wall (due to gravity) as something other than the result of the faulty design and workmanship of the wall; (g) contrary to Plaintiffs' interpretation, under the Resulting Loss Exception, the only instances in which the Faulty Design and Workmanship Exclusion will be negated and the loss or damage covered as occurring in connection with a non-excluded cause of loss is where the non-excluded cause of loss is something like fire, wind, snow, external collision by or contact with trees or other objects (which makes sense); and (h) if the Court adopted Plaintiffs'

argument, no insurance policy would be able to exclude coverage for any reason because there would always be a circumstance in the continuum of the happening of the loss occurring (i.e. degradation, collapse, disintegration) that would not be specifically stated in the policy, which is pure sophistry. (*Id*. [emphasis added].)

Second, Defendant argues, Plaintiffs' contention that Defendant is estopped from asserting a valid exclusion to coverage is without merit for the following reasons: (a) for coverage by estoppel to occur, an insured must establish that the insurance carrier's conduct resulted in the imposition of coverage where it otherwise did not exist, and that the insured was prejudiced by the carrier's subsequent denial of coverage; (b) here, Plaintiffs have not established, and cannot establish, that Defendant's conduct (in paying for the filter media and debris removal) resulted in coverage (for the wall) because the payment for the filter media and debris removal arose from separate portions of the Policy that specifically provided for payment for business property and for debris removal which are independent of any obligations or exclusions with regard to the structure (and Defendant specifically and repeatedly reserved its rights with regard to the denial of coverage for the wall when it made payment for the media and debris removal in 2011); (c) in any event, Plaintiffs have not established, and cannot establish, prejudice because recovery for the faulty design and workmanship defects complained of is available to them from the litany of engineers and contractors that Plaintiffs have sued in their state action; and (d) as a result, there is a meaningful distinction that can be drawn between the wall collapse and the loss of media. (*Id*.)

### 3. Plaintiffs' Reply Memorandum of Law

Generally, in their reply to Defendant's response, Plaintiffs assert five arguments. (Dkt. No. 59 [Plf.'s Reply Memo. of Law].)

First, Plaintiffs argue, expert report and potential testimony of Mr. Nielander (against whom Defendant launches an *ad hominem* attack) are both reliable and relevant to the Court's and trier-of-fact's evaluation and interpretation of the Policy (and thus admissible) under Fed. R. Evid. 702, as is evident from the fact that Defendant has not formally moved to preclude that report and potential testimony. (*Id*.)

Second, Plaintiffs argue, Defendant's opinions and conclusions lack factual and legal support, and in fact the only expert opinion that provides any analysis or conclusion regarding the proximate, or "but for," cause of the wall collapse is that of Plaintiffs' expert, Dr. Paul G. Carr, who opines that, while elements of the design and construction of the C-Cell Filter Complex were deficient, it was actually the operation of the subject tanks, and their subjection to operating forces and varying loads and forces, which proximately led to overstress and the eventual failure and collapse of the west wall of the C-Cell Filter Complex. (*Id*.)

Third, Plaintiffs argue, in Paragraph 37 of its Rule 7.1 Response, Defendant admits that "collapse" is not an excluded cause of loss under the Policy, rendering its argument that the collapse was the result of defective design or workmanship both meritless and irrelevant. (*Id*.)

Fourth, Plaintiffs argue, Defendant cannot establish that the Faulty Design and Workmanship Exclusion applies because Defendant is precluded from offering expert testimony to support its defective design or workmanship and proximate cause burdens (*Id*.)

Fifth, Plaintiffs argue, Defendant fails to cite a single legal or factual authority in support of its (vague) contention that the Resulting Loss Exception is inapplicable. (*Id*.)

### C.    Parties' Briefing on Defendant's Motion

#### 1.    Defendant's Memorandum of Law

Generally, in its motion for summary judgment, Defendant argues that the Faulty Design and Workmanship Exclusion to property coverage applies and vitiates coverage for six reasons. (Dkt. No. 49, Attach. 1 [Def.'s Memo. of Law].)

First, Defendant argues, the affidavit of Binghamton-Johnson City Joint Sewage Board Superintendent Catherine Aingworth (submitted by Plaintiffs in opposition to a motion dismiss in their state court action) demonstrates that the subject wall failure occurred as the result of faulty design and workmanship in that it acknowledges, *inter alia*, that (1) "defects and deficiencies" appeared in the plant's systems and structures "[f]rom the beginning," and (2) before the failure of the wall, there were "numerous leaks at the intersecting wall joints at the C-cell and N-cell walls, multiple leaks at pipe penetrations through structural walls, inadequate HVAC output, frequent mechanical failures, numerous SCADA problems, missing and malfunctioning personal computer software and licensing data, and missing as-built drawings and product submittals for the plant and its systems."  (*Id.*)

Second, Defendant argues, the complaint in Plaintiffs' New York State court action against its design engineers and contractors demonstrates that the subject wall failure occurred as the result of faulty design and workmanship, in that it alleges, *inter alia*, that (1) the plant was "plagued by numerous design defects, errors, and omissions that have compromised the structural, mechanical and operational integrity of the systems constructed and installed as part of the Phase III Improvements," (2) its "Engineer of Record," C&S Engineers, "failed to fulfill its duties, responsibilities and obligations" of providing and preparing "appropriate, accurate, complete, code compliant and fully coordinated documents and information to describe the

overall design, components, construction and operational functions and details of the project," (3) one of its contractors, Infilco Degremont Inc., "directed supervised and otherwise participated in the installation" of materials at the plant "in a reckless, careless, and negligent manner causing sufficient structural and related damage to the BJC Plant," and (4) another of its contractors, C.O. Falter, "used or allowed to be used inferior, unsuitable and defective materials, unskilled and inadequate labor and inadequate equipment in the performance of its work and services." (*Id*.)

Third, Defendant argues, the LMK Engineers engineering report commissioned by Plaintiffs demonstrates that the subject wall failure occurred as the result of faulty design and workmanship in that it, *inter alia*, (1) notes the existence of "several areas where the contractor did not comply with the drawings and specifications," (2) warns that "failure to design the liquid retaining structures to ACI 350 criteria could lead to severe serviceability problems," and (3) states that C&S Engineers' decision to increase the joint spacing criteria "increased the potential for cracking and leaking from shrinkage stresses," and cautioned plaintiffs that such leakage "could affect the long term performance of the wall." (*Id*.)

Fourth, Defendant argues, the EFI Global engineering report commissioned by Defendant demonstrates that the subject wall failure occurred as the result of faulty design and workmanship in that it, *inter alia*, (1) determines the cause of the wall failure to be "a combination of a design that did not comply to code and modifications made during the construction of the facility that further reduced the strength of the wall," (2) identifies the "point of origin of the wall failure" as "the lack of adequate development length and/or bond at the lap splice of the main reinforcing on the inside face of the wall," (3) notes evidence that repairs to cracks in concrete in the cell wall had been attempted before the failure of the wall, (4)

determines that the west concrete wall that failed was "substantially undersized" and lacked

support from the interior perpendicular walls dividing the adjacent tanks of the plant, and (5)

observes that the horizontal reinforcing used at the interior dividing walls failed to comply with

the design specifications called for in the

construction documents, and that the 144-foot long wall that failed was designed and constructed

without any expansion or contraction jointing. (*Id*.)

Fifth, Defendant argues, the 2008 and 2009 Annual Reports of Plaintiff Binghamton-

Johnson City Joint Sewage Board demonstrate that the subject wall failure occurred as the result

of faulty design and workmanship in that it sets forth a list of "known issues" regarding the

structural integrity of the plant, including "[r]ust streaks down the walls from leaking

penetrations and cracks in concrete tank walls" and "numerous cracks and leaks in concrete cell

walls." (*Id*.)

Sixth, Defendant argue, there is no valid exception to the Faulty Design and

Workmanship Exclusion to coverage in the Policy, just as there was no such valid exception in

the factually similar case of *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d

501, 503 (5th Cir. 2000). (*Id*.)

## 2. Plaintiffs' Opposition Memorandum of Law

Generally, in their response to Defendant's motion, Plaintiffs asserts two arguments.

(Dkt. No. 54 [Plf.'s Opp'n Memo. of Law].)

First, Plaintiffs argue, Defendant's motion should be denied because (a) in order for

Defendant to satisfy its burden and demonstrate that the design and/or construction was defective

(and the proximate cause of the wall collapse), it must submit expert testimony, (b) Defendant

has not submitted such expert testimony, and (c) to the contrary, Plaintiffs' expert, Dr. Paul Carr,

undertakes a "causation inquiry" and concludes that it was the operation of the subject tanks and specifically their subjection to "operating forces" (consisting of "a series of varying [dynamic] loads and forces") that proximately caused overstress to, and the eventual failure and collapse of, the west wall. (*Id.*)

Second, Plaintiffs argue, in any event, the collapse and loss are nonetheless covered under the Resulting Loss Exception to the Faulty Design and Workmanship Exclusion, because the covered loss or damage occurred in connection with a cause of loss not otherwise excluded by the Policy, i.e., the collapse of the wall. (*Id.*)

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply to Plaintiffs' response, Defendant asserts two arguments. (Dkt. No. 61 [Def.'s Reply Memo. of Law].)

First, Defendant argues, the expert evidence relied on by Defendant coupled with Plaintiffs' admissions (e.g., in their state action complaint and the affidavit of Aingworth in the state action) leads to in inexorable conclusion that the policy's Faulty Design and Workmanship Exclusion vitiates coverage for the losses sought by Plaintiff. (*Id.*)

Second, Defendant argues, the case law cited by Plaintiffs (none of which is binding on this Court) generally supports Defendants' motion and in any event is not sufficiently analogous to this case to lend credible support to Plaintiffs' opposition. (*Id.*)

### D. Statements of Undisputed Material Facts

### 1. Undisputed Facts Material to Plaintiffs' Motion

Unless otherwise followed by citations to the record, the following material facts have been asserted and supported by Plaintiffs' in their Statement of Material Facts, and not expressly denied with a supporting record citation by Defendant in its Response thereto, and thus admitted

pursuant to Local Rule 7.1 of the Local Rules of Practice for this Court, as explained below in Part II of this Decision and Order. (*Compare* Dkt. No. 47, Attach. 2 [Plfs.' Rule 7.1 Statement] *with* Dkt. No. 56, Attach. 1 [Def.'s Rule 7.1 Response].)

1.      The Binghamton-Johnson City Joint Sewage Board ("Plaintiff Board") is a public board that is comprised of members appointed by the City of Binghamton, a New York municipal corporation located in Broome County, New York ("Plaintiff Binghamton"), and the Village of Johnson City, a New York municipal corporation located in Broome County, New York ("Plaintiff Johnson City").

2.      Plaintiff Board operates and maintains the Binghamton-Johnson City Joint Sewage Treatment Plant ("Plant") located at 4480 Vestal Road, Vestal, New York.

<u>The Project</u>

3.      In 2001, pursuant to a Consent Order issued by the New York State Department of Environmental Conservation ("NYS DEC"), Plaintiffs began reconstruction of the Plant to expand its wastewater treatment facilities to meet effluent quality requirements for the discharge of treated waste water into the Susquehanna River and Chesapeake Bay Watershed and to increase the Plant's secondary treatment capacity to a peak discharge rate for finished effluent of sixty million gallons per day ("mgd") during peak demand and storm water flows in the region (the "Project").

4.      As part of the Project, Plaintiffs procured a biological aerated filter ("BAF") system to replace an existing activated sludge secondary treatment process. The work included the demolition of existing Plant facilities, the construction of a seventy mgd BAF influent pump station and mechanical systems, the construction of reinforced concrete facilities and masonry buildings to house the BAF system, the conversion of four secondary clarifiers to primary

clarifiers, new controls and monitoring systems, new electrical service to the filter complex, new primary sludge pumps, and additional chlorination tanks.

Catastrophic Structural Wall Collapse

5.      On May 16, 2011, a fifteen-foot-high, one-hundred-foot-long portion of the exterior wall on the western side of the Plant's C-Cell Complex collapsed outward.

6.      The C-Cell Complex is a series of eight biological aerated filters. Eight cells are arranged in two banks of four cells each and are separated by a pipe gallery at grade level with the backwash and effluent channels directly above the gallery. The cells are identified as C-1 through C-4 on the west side adjacent to Fuller Hollow Creek and C-5 through C-8 on the east side. Each cell contains filter media supported by a concrete slab (referred to as the monoflor slab), which is in turn directly supported off the filter base mat by a closely spaced grid of six-inch PVC pipe columns filled with concrete.

7.      The collapsed wall had been constructed during part of the "Phase III" of the Project from 2004 to 2006 to provide the exterior containment of BAF cells C-1 through C-4 of the Plant. The west wall of cells C-3 and C-4 collapsed in total. On cell C-2, the wall broke away between about midway along its west side.

8.      As a result of the collapse, approximately 580,000 gallons of partially treated wastewater and Biolite L.2.7mm filter media poured out of the cells, into a nearby creek and onto an adjacent New York State Electric and Gas Utility ("NYSEG") parking lot, causing property damage and an environmental hazard.

9.      The BAF process systems in the area of cells C-1 through C-4 were destroyed and/or damaged.  (Dkt. No. 47, Attach. 3, at ¶ 13 [Aingworth Affid.]; Dkt. No. 47, Attach. 5 [attaching photographs of the site].)

10. The entire concrete structure of the west wall of cells C-1 through C-4 and the interior dividing walls between C-1 through C-4 were destroyed and/or damaged. (*Id.*)

11. A majority of the contents of cells C-2 through C-4 were emptied and lost, with the remaining portion ultimately deemed unusable.

<u>The Policy</u>

12. Plaintiffs purchased Insurance Policy Number SDISSP 9154666-0/0 (the "Policy") for the period from January 1, 2011, to January 1, 2012, from Defendant American Alternative Insurance Corporation ("Defendant").

13. The Policy provides $90,867,404 blanket liability property damage, pollution remediation expenses of $25,000 for a covered cause of loss and of $100,000 for a specified cause of loss, as well as a general aggregate liability coverage of $3,000,000.

14. Plaintiff Board's deductible under the Policy was $5,000 per occurrence.

15. Damage to real property at the premises is addressed in the Policy as follows:

**Coverage A. "Real Property"**

We will pay for direct physical loss or damage to "real property" at a "premises" caused by or resulting from any "covered cause of loss". The most we will pay is described under **SECTION IV. WHAT WE WILL PAY.**

16. Damage to personal property at the premises is addressed in the Policy as follows:

**Coverage B. "Personal Property"**

We will pay for direct physical loss or damage to "personal property" at a "premises" caused by or resulting from any "covered cause of loss". The most we will pay is described under **SECTION IV. WHAT WE WILL PAY.**

17. Pursuant to the Policy, covered causes of loss are as follows:

**SECTION III. COVERED CAUSES OF LOSS**

"Covered cause of loss" means any risk of direct physical loss or damage except as excluded or limited below.

18.     Pursuant to the Policy, the exclusions include the following:

**Exclusions**

We will not pay for loss or damage caused by or resulting directly or indirectly from the following causes, or occurring in the following situations. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently with or before, during, or after the loss or damage. But we will cover resulting fire or explosion, meaning a fire or explosion that results from any cause or loss other than "war", whether or not that cause of loss itself is covered under this coverage part.

. . .

**22.     Faulty Design and Workmanship**

Faulty design, workmanship and material including the cost of correcting faulty design, workmanship, material, manufacture or installation, alteration, repair or work on covered "real property" or "personal property". But we will cover loss or damage that results from any of these, if the loss or damage occurs in connection with any cause of loss not otherwise excluded by this coverage part. This exclusion does not apply to "computer equipment".

(Dkt. No. 47, Attach. 4, at 34, 36 [Ex. A to Aingworth Affid.].)

19.     Pursuant to the Policy's Declarations, the valuation of the limit of insurance is based upon "replacement cost."

20.     The Policy states that, if "replacement cost" is indicated in the Declarations, Defendant "will pay the 'replacement cost' of any loss or damage to 'real property' or 'personal property', less any deductible that applies."

21.     The Policy states that, if "replacement cost" is indicated in the Declarations, Defendant will pay the replacement cost so long as "[t]he repairs to or replacement of the 'real

property' or 'personal property' are of the same kind and quality and at the same 'premises' as

the 'real property' or 'personal property' suffering the loss or damage . . . ."

22.     The Policy's definitions are set forth in Section VI and provide, in relevant part,

as follows:

> 5.     "Covered cause of loss" is defined in SECTION III. COVERED
>         CAUSES OF LOSS.
>
> . . . .
>
> 23.     "Personal property" means all property used in your "operations",
>         other than "real property", including but not limited to furnishings
>         and equipment, building contents, "computer equipment" or
>         communication systems, provided the property is on your
>         "premises" and also provided you own the property or the property
>         is in your custody or control, and you are responsible for it, even
>         though it belongs to someone else.
>
> . . . .
>
> 27.     "Real property" means buildings or structures described in the
>         Declarations as 'items', including:
>         a.     Aboveground piping;
>         b.     Aboveground and belowground 'penstock';
>         . . .
>         d.     All appurtenant buildings or structures;
>         e.     Alterations and repairs to the buildings or structures;
>         f.     Completed additions;
>         . . .
>         i.     Outdoor fixtures;
>         . . .
>         k.     Permanently installed fixtures, machinery, and equipment;
>
> . . . .
>
> 29.     "Replacement costs" is the amount it would take, following direct
>         physical loss or damage, to replace property with property of the
>         same kind and quality, determined at the time of loss, without
>         deduction for deterioration, depreciation or obsolescence.
>
> . . . .

33. "Specified cause of loss" means fire, lightning, windstorm or hail, explosion, riot or civil commotion, "vehicles" or aircraft, smoke, sonic boom, vandalism and malicious mischief, "sprinkler leakage", sinkhole collapse", volcanic action", failing objects, weight of ice, snow or sleet, or water damage. Water damage means only accidental discharge or leakage of water or steam as the direct result of the breaking or cracking of any part of a system or appliance containing water or steam. "Specified cause of loss" does not include "remediation expenses" resulting from the spilling or dripping of gasoline, diesel fuel or other pollutants while being delivered by "vehicles" into storage tanks or other repositories, and/or when "vehicles" are being fueled.

23. Pursuant to the Policy, in the event of event of loss or damage to insured property, Plaintiffs are required to notify the police if a law may have been broken.

24. Pursuant to the Policy, Plaintiffs are required to provide Defendant with "prompt notice" of any loss or damage, which includes a "description of the property involved." Further, Plaintiffs are required to notify Defendant of how, when and where the loss or damaged occurred.

25. Pursuant to the Policy, Plaintiffs are required to provide Defendant with access to inspect the covered property to prove the loss or damage.

26. Pursuant to the Policy, Plaintiffs are required to provide Defendant with a sworn Proof of Loss statement that includes a description of the property involved (which Defendant requests to investigate the claim). (Dkt. No. 47, Attach. 4, at 42, 43 [Ex. A to Aingworth Affid.].)

27. Pursuant to the Policy, Plaintiffs are required to cooperate with Defendant in the investigation or settlement of any coverage claim.

28. Pursuant to the Policy, Defendant

will pay for covered loss or damage within 30 days after [it] receive[s] the sworn proof of loss if: (1) [the insured has] complied with all terms of this coverage part; and (2) [Defendant has] reached agreement with [the insured] on the amount of loss, or an appraisal award has been made.

(Dkt. No. 47, Attach. 4, at 44 [Ex. A to Aingworth Affid.].)

29.     The C-Cell Filter Complex and the associated C-Cell BAF Building are described as "business personal property" in a portion of the Policy that states property values.  (Dkt. No. 47, Attach. 4, at 22 [Ex. A to Aingworth Affid.].)

30.     Plaintiffs are insureds under the Policy.

The Loss and Claim

31.     As a result of the wall collapse, the Plant suffered significant losses.

32.     Pursuant to § V, ¶ 6 of the Policy, on May 16, 2011, Plaintiffs gave Loss Notice to Defendant of their damage and losses from the wall collapse earlier that day, and provided the following "DESCRIPTION OF LOSS & DAMAGE": "Wall collapse at BAF Bldg. Tanks emptied treated sewage into nearby creek and NYSEG parking lot, into cars. DEC has been notified. CONTACT INSURED ASAP."  (Dkt. No. 47, Attach. 6, at 4 [Ex. C to Aingworth Affid.]; Dkt. No. 47, Attach. 3, at ¶ 14 [Aingworth Affid.].)

33.     In their Loss Notice, Plaintiffs stated that, pursuant to § V, ¶ 6 of the Policy, they had notified the NYS DEC of the wall collapse.

34.     Further, in their Loss Notice, Plaintiffs stated that the wall collapse occurred at approximately 9:15 a.m., on May 16, 2011, at the BAF Blower Building, Building No. 18, at 4480 Old Vestal Road, Vestal, New York.

35.     On May 17, 2011, inspectors from Defendant inspected the site and resulting damage of the wall collapse.

36.     By letter dated May 20, 2011, Defendant, through a Property Specialist at Glatfelter Claims Management, Inc. ("GCM"), provided a preliminary analysis of its insurance coverages.  (Dkt. No. 47, Attach. 7, at 5 [Ex. D to Aingworth Affid.]; Dkt. No. 47, Attach. 3, at ¶ 16 [Aingworth Affid.].)

37.     On July 22, 2011, Defendant, again through GCM, sent a declination of coverage contending that Plaintiffs' losses or damages were not covered under the Policy because of certain policy exclusions, including the Faulty Design and Workmanship Exclusion.

38.     The Policy does not contain an exclusion labeled "Collapse."  (Dkt. No. 47, Attach. 4, at 34-37 [Ex. A to Aingworth Affid.].)

39.     Pursuant to § V, ¶ 6 of the Policy, on October 10, 2011, Plaintiffs submitted to GCM a Proof of Loss Statement, on a form provided by Defendant (the "Statement").  In the Statement, Plaintiffs claimed that Defendant insured them against loss by "Collapse" of covered property, and attached documentation intended to support (a) the stated cause of the claim, and (b) the value of the claim.  (Dkt. No. 47, Attach. 9 [Ex. F to Aingworth Affid.]; Dkt. No. 47, Attach. 3, at ¶ 18 [Aingworth Affid.].)

40.     On December 29, 2011, Defendant, through GCM, acknowledged that certain costs incurred by Plaintiffs to collect, load and haul the damaged Biolite L.2.7mm filter media from the Plant to the Broome County Landfill were covered losses under the Policy.

41.     Plaintiffs accepted Defendant's payment of $25,067.78 for the costs incurred to collect, load and haul the damaged Biolite L.2.7mm filter media from the Plant to the Broome County Landfill, endorsing GCM's check by writing, "Endorsed with a Full Reservation of Rights."  (Dkt. No. 47, Attach. 11, at 2 [Ex. H. to Aingworth Affid.]; Dkt. No. 47, Attach. 3, at ¶ 20 [Aingworth Affid.].)

42.     As part of Defendant's payment of $25,067.78, Defendant deducted Plaintiffs' deductible of $5,000.

43.     On January 18, 2012, Defendant, through GCM, acknowledged that the replacement costs to purchase and install the media and gravel for cells C-2 through C-4, and the associated professional engineering and oversight expenses, were covered losses under the Policy.

44.     Plaintiffs accepted Defendant's payment of $283,572.75 for the estimated replacement costs to install the filter media and gravel for cells C-2 through C-4 endorsing GCM's check by writing, "Endorsed with a Full Reservation of Rights." (Dkt. No. 47, Attach. 13, at 3 [Ex. J. to Aingworth Affid.]; Dkt. No. 47, at ¶ 22 [Aingworth Affid.].)

45.     The terms of the Policy by which coverage is provided have never been modified or amended.

### 2.     Undisputed Facts Material to Defendant's Motion

Unless otherwise followed by citations to the record, the following material facts have been asserted and supported by Defendant in its Statement of Material Facts, and not expressly denied with a supporting record citation by Plaintiffs in their Response thereto, and thus admitted pursuant to Local Rule 7.1 of the Local Rules of Practice for this Court, as explained below in Part II of this Decision and Order. (*Compare* Dkt. No. 49, Attach. 2 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 54, Attach. 1 [Plfs.' Rule 7.1 Response].)[1]

---

[1]     Accompanying Plaintiffs' Response to Defendant's Statement of Material Facts is a "Counterstatement of Material Facts." (Dkt. No. 54, Attach. 1, at 11-18 [Plfs.' Counterstatement of Material Facts].) However, the facts are those regarding "which [Plaintiffs] contend *there exists no genuine issue*." (*Id*. [emphasis added]) Neither the Federal Rules of Civil Procedure nor the Local Rules of Practice permit such a counterstatement in response to a motion for summary judgment. Rather, the Local Rules of Practice permit such a counterstatement only to the extent that it asserts facts which the not-movant "contends *are in dispute*." N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's response may also set forth any additional material facts that the non-movant contends *are in dispute* in separately numbered

1. The Village of Johnson City ("Plaintiff Johnson City") is a municipal corporation organized and existing under the laws of the State of New York with its principal place of business located at 243 Main Street, Johnson City, New York.

2. Plaintiff Johnson City is co-owner of the Binghamton-Johnson City Joint Sewage Treatment Plant in Vestal, New York ("Plant").

3. The City of Binghamton ("Plaintiff Binghamton") is a municipal corporation organized and existing under the laws of the State of New York, with its principal place of business located at 38 Hawley Street, Binghamton, New York.

4. Plaintiff Binghamton is co-owner of the Plant.

5. Plaintiff Binghamton-Johnson City Joint Sewage Board ("Plaintiff Board") is a duly authorized public board organized and existing under the laws of the State of New York, Plaintiff Johnson City and Plaintiff Binghamton, and is charged with operating and maintaining the Plant.

6. The Plant serves Plaintiff Binghamton, Plaintiff Johnson City, and ten surrounding communities in the Southern Tier of New York State.

7. At all relevant times hereto, the Plant was under a Consent Order with the New York State Department of Environmental Conservation to expand its wastewater treatment facilities to meet certain effluent quality requirements for the discharge of treated wastewater into the Susquehanna River and Chesapeake Bay Watershed.

_____

paragraphs.") (emphasis added).  This, of course, makes sense, given that what is needed for a non-movant to defeat a motion is a genuine *dispute* of fact; and the only point of asserting undisputed facts would be to prevail on a cross-motion for summary judgment (which has *not* been filed here, given that Plaintiffs previously moved for summary judgment).  However, rather than strike the Plaintiffs' "Counterstatement of Material Facts," the Court will construe it as containing facts that are asserted by Plaintiffs to be in dispute (for purposes of Defendant's motion).

8. In 2001, a five-month pilot study was conducted to determine whether the use of a biological filtration system could meet the objectives and requirements of the Consent Order and fit within the current site footprint of the Plant. This study concluded that a three-stage biological filter system for carbon removal, nitrification and de-nitrification would meet the terms of the Consent Order and fit within the existing site limits.

9. Thereafter, Plaintiffs retained C&S Engineers, Inc., to develop design plans, specifications and contract documents for the implementation of the improvements to the Plant, known as Phase III Improvements at the Plant ("Phase III Improvements").

10. Plaintiffs entered into four contracts for the procurement of new equipment, upgrades and replacements of existing systems, and demolition of existing Plant solids.

11. The Plant never achieved a state where all systems were fully operational. A certificate of final completion was never issued. As-built drawings were never been produced or submitted.

12. From the beginning of Plant start-up and operations, Plaintiffs observed defects and deficiencies in various Plant systems and components.

13. The observed problems included, but were not limited to, (a) leaks at the intersecting wall joints at the C-cell and N-cell walls, (b) leaks at pipe penetrations through structural walls, (c) inadequate filter media, (d) inadequate heating ventilating and air conditioning output, (e) frequent mechanical failures, (f) numerous supervisory control and data acquisition ("SCADA") problems, (g) missing and malfunctioning personal computer software ("PCS") and licensing data, and (h) missing as-built drawings and product submittals for the Plant and its systems.

14.     As a result of these and other observed conditions, and after many months of attempts to diagnose and correct problems, Plaintiffs retained an engineering firm to conduct a post-construction quality audit of the Phase III Improvements Project. The engineering report was undertaken by LMK Engineers, LLC, in December 2010 and completed in February 2011 ("the LMK Report").

15.     The LMK Report identified approximately 157 design and construction errors, omissions and defects.  Plaintiffs reviewed the LMK Report and began making plans for remedial measures.

16.     On May 16, 2011, the Plant suffered a major structural failure when an approximately twenty-three-foot high, one-hundred-foot long portion of the exterior wall on the western side of the Plant failed.

17.     The failed wall was constructed to enclose four cells that were part of the secondary treatment process at the Plant.

18.     Thereafter, Plaintiffs retained consultants to perform additional audits and inspections of the Plant, including a structural safety report. These additional engineering reports and studies found numerous design and construction errors, omissions and defects in the structure of the Plant, as well as incorrect, defective and deficient plans, specifications, and oversight over the Phase III Improvements.

19.     The structural safety report analyzed the collapsed portions of the wall and found, in addition to many fundamental design and construction errors, omissions and defects, that large sections of the concrete cells were overstressed and structurally unstable.

20.     The structural safety report recommended that fourteen of the Plant's twenty secondary treatment cells be drained and placed "off-line" pending the extensive repair and remediation efforts that would be required to make the cells functionally and structurally operational.

21.     On May 16, 2011, Plaintiffs provided notice of loss to Defendant.  On May 17, 2011, Defendant, through its claims administrator, Glatfelter Claims Management Inc. ("GCM"), engaged Edgar Eslinger, P.E., of EFI Global to investigate and inspect the failed wall. Defendant advised Plaintiffs by letter of the provisions of the property coverage part of the insurance policy applicable to their claim, including the Faulty Design and Workmanship Exclusion. Defendant further advised Plaintiffs that it would contact them once its investigation was complete in regard to what coverage, if any, was applicable to the loss claimed by Plaintiffs.

22.     On June 20, 2011, Defendant contacted Plaintiffs again by letter to advise them as to the pending status of its investigation and follow up on documents that Defendant previously requested from Plaintiffs.

23.     On July 22, 2011, Defendant contacted Plaintiffs again by letter to advise them, among other things, that it was in receipt of the report of Edgar Eslinger, P.E., and that the Faulty Design and Workmanship Exclusion to coverage under the Policy applied to vitiate coverage for Plaintiffs' claim. A copy of the report completed by Edgar Eslinger, P.E., which is dated July 20, 2011, was provided to Plaintiffs along with Defendant's letter of July 22, 2011.

24.     In its letter of July 22, 2011, Defendant highlighted the following conclusions made by Mr. Eslinger: (a) the cause of the wall failure appears to have been the result of an insufficient lap splice of the main reinforcing at the base of the wall; (b) the splice lengths listed

on the construction documents were not in compliance with the ACI 318 and code required lengths where more than 50 percent of the main reinforcing is spliced at a single section; (c) the location of the lap splice of the main wall reinforcement was changed during construction and the lap lengths were reduced; (d) the west wall of the tank appears to have been designed as a cantilevered wall without the appropriate, code required safety factors; (e) the testing of the concrete material does not indicate any intrinsic material issues were responsible for the large-scale cracking of the concrete; (f) modifications were made during construction and the in-place construction, including wall intersection reinforcement and waterstops, did not conform to the original construction documents; (g) the 144 foot-long wall was designed and constructed without any expansion or contraction jointing, which may have caused or aggravated the observed wall cracking; and (h) the deflection of the west wall, modifications made to seal the wall joints and cracking of the wall should have alerted the owner and design team that issues existed with the integrity of the wall.

25.     On or about March 28, 2012, Plaintiffs commenced this declaratory judgment action against Defendant on or about. On May 11, 2012, Defendant filed its Answer.

26.     On or about June 4, 2012, Plaintiffs commenced a separate action in New York State court against the design engineers and contractors that they had retained to design and construct the Phase III Improvement project. Plaintiffs' state court complaint alleges that the Plant was "plagued by numerous design defects, errors, and omissions that have compromised the structural, mechanical and operational integrity of the systems constructed and installed as part of the Phase III Improvements."

27.     Plaintiffs' state court complaint arises–in part–out of the same May 2011 failure of the wall at the Plant that gives rise to the current action.  (Dkt. No. 49, Attach. 14, at ¶¶ 41-48, 58-59, 63, 130 [Ex. G to Hannigan Decl.].)

28.     Plaintiffs' state court complaint alleges that the Plant was "not properly designed," and that "defects and deficiencies" appeared in various Plant systems and components "from the beginning."

29.     Plaintiffs' state court complaint also alleges that the Plant "never achieved a state where all systems were fully operational."  The state court complaint similarly alleges that Plaintiffs' "Engineer of Record," C&S Engineers, "failed to fulfill its duties, responsibilities and obligations" of providing and preparing "appropriate, accurate, complete, code compliant and fully coordinated documents and information to describe the overall design, components, construction and operational functions and details of the project."  According to Plaintiffs, C&S "allowed numerous construction defects, deficiencies and deviations from the design plans and specifications to occur and persist during the construction and installation of the Phase III Improvements."

30.     Plaintiffs' state court complaint also alleges, upon information and belief, that one of their contractors, Infilco Degremont Inc., "directed supervised and otherwise participated in the installation of certain of its materials and equipment on the Project with other contractors and design professionals," and did so "in a reckless, careless, and negligent manner causing sufficient structural and related damage to the BJC Plant."

31.     Plaintiffs' state court complaint also alleges that another of their contractors, C.O. Falter, "used or allowed to be used inferior, unsuitable and defective materials, unskilled and

inadequate labor and inadequate equipment in the performance of its work and services." Plaintiffs further alleged that C.O. Falter's workmanship was "defective, unprofessional, deficient, incorrect and unworkmanlike."

32.     Plaintiffs' state court complaint also alleges that their concrete contractor, Barney & Dickinson, Inc., operated in an "unworkmanlike" manner, and "carelessly and negligently used inferior, unsuitable, and defective concrete materials and components that did not comply with design plans and specifications in the approved submittals."

33.     In connection with the New York State court action, Plaintiff Board's superintendent, Catherine Aingworth, submitted an affidavit in opposition to a motion to dismiss made by Delta Engineers, Architects & Land Surveyors, P.C. That affidavit was filed with the Office of the Broome County Clerk on or about February 21, 2012.

34.     In her state court affidavit, Superintendent Aingworth states that "defects and deficiencies" appeared in the Plant's systems and structures "[f]rom the beginning." She also states that, "[t]o her knowledge, there was no final completion of the Project and a certificate of final completion has not been issued." (Dkt. No. 49, Attach. 20, at ¶ 9 [Aingworth Affid.].) Moreover, she states that

> [t]here were numerous leaks at the intersecting wall joints at the C-cell and N-cell walls, multiple leaks at pipe penetrations through structural walls, inadequate HVAC output, frequent mechanical failures, numerous SCADA problems, missing and malfunctioning personal computer software ('PCS') and licensing data, and missing as-built drawings and product submittals for the plant and its systems.

(*Id*. at ¶ 11.)

35.     Also in her affidavit, Superintendent Aingworth states that Plaintiffs spent "several months . . . attempting to diagnose and correct the problems" that she described in Paragraph 11 of her affidavit.

36.     Also in her affidavit, Superintendent Aingworth states that, after Plaintiffs'

several-month effort to identify and correct problems, Plaintiffs retained LMK Engineers, LLC,

to conduct an engineering audit. Aingworth states that LMK "found design and/or construction

errors in virtually every area audited."

37.     The design and construction errors determined by LMK were known to

Superintendent Aingworth before the failure of the wall.  (Dkt. No. 49, Attach. 20, at ¶ 13

[Aingworth Affid.]; Dkt. No. 54, Attach. 1, at ¶ 37 [Plfs.' Rule 7.1 Response, admitting fact

asserted].)

38.     The LMK Report is a post-construction quality audit of the Phase III

Improvements Project at the Plant based on a "comprehensive inspection" of the Plant and a

"detailed review of the design documents" and construction records relative to the project.

39.     To support their state court action against the various firms that they had retained

to design and construct the Phase III Improvements at the Plant, Plaintiffs rely upon, *inter alia*,

the LMK Report.  (Dkt. No. 49, Attach. 14, at ¶¶ 39-40, 44-47 [Ex. G to Hannigan Decl.]; Dkt.

No. 54, Attach. 1, at ¶ 39 [Plfs.' Rule 7.1 Response, admitting fact asserted].)

40.     The LMK Report identified certain contractors who had, *inter alia*, failed to

provide adequate documentation, and it recommended that Plaintiffs, *inter alia*, obtain certain

identified documentation.  (Dkt. No. 49, Attach. 8, at 12, 19, 20, 23 [Ex. E to Hannigan Decl.].)

In addition, the LMK Report characterized "design and configuration control during construction

and into plant operations" as "nonexistent." (Dkt. No. 49, Attach. 9, at 28 [attaching page "72"

of Ex. E to Hannigan Decl.]; Dkt. No. 54, Attach. 1, at ¶ 40 [Plfs.' Rule 7.1 Response, admitting

fact asserted].)

41.     The LMK Report "determined that the root cause for these noted deficiencies is inadequate construction management."  (Dkt. No. 49, Attach. 8, at 4 [Ex. E to Hannigan Decl.]; Dkt. No. 54, Attach. 1, at ¶ 41 [Plfs.' Rule 7.1 Response, admitting fact asserted].)  The LMK Report went on to "opin[e] that the Owner should share some level of responsibility in this matter as some of the noted deficiencies should have been clearly evident from routine Owner inspections."  (*Id.*)

42.     The LMK Report noted the existence of "several areas where the contractor did not comply with the drawings and specifications."  The LMK Report stated that the "structural design may not be adequate for compliance with ACI 350," building criteria "specifically tailored for sewer plant structures."

43.     The LMK Report stated that "failure to design the liquid-retaining structures to ACI 350 criteria could lead to severe serviceability problems."

44.     The LMK Report also stated that C&S Engineers' decision to increase the joint spacing criteria "increased the potential for cracking and leaking from shrinkage stresses," and cautioned Plaintiffs that such leakage "could affect the long term performance of the wall."

45.     The LMK Report confirmed that leaks existed at the vertical joints between the cells, which it characterized as being both design errors/omissions and construction errors/omissions.

46.     In the EFI Global report rendered by Mr. Eslinger, Mr. Eslinger concluded that "the cause and origin of the collapse appears to be a combination of a design that did not comply to code and modifications made during construction of the facility that further reduced the strength of the wall."  (Dkt. No. 49, Attach. 10, at 2, 11 (Ex. F to Hannigan Decl.]; Dkt. No. 54, Attach. 1, at ¶ 46 [Plfs.' Rule 7.1 Response, effectively admitting fact asserted].)

47. According to Mr. Eslinger, the "point of origin of the wall failure" was "the lack of adequate development length and/or bond at the lap splice of the main reinforcing on the inside face of the wall."

48. Mr. Eslinger observed evidence that repairs to cracks in concrete in the cell wall had been attempted before the wall failure of May 16, 2011.

49. Mr. Eslinger determined that the strength of the west concrete wall that failed was "substantially undersized" and lacked support from the interior perpendicular walls dividing the adjacent tanks of the Plant.

50. Mr. Eslinger also observed that the horizontal reinforcing used at the interior dividing walls failed to comply with the design specifications called for in the construction documents, and that the 144-foot long wall that failed was designed and improperly constructed without any expansion or contraction jointing. Mr. Eslinger opined that this failure may have caused or aggravated the observed wall cracking, and "should have alerted the owner and design team that issues existed with the integrity of the wall."

51. Plaintiffs were aware of numerous problems associated with design and construction of the Phase III Improvement project at the Plant by the conclusion of 2008, years before the failure of May 16, 2011.

52. Plaintiff Board's Annual Report of December 2008 set forth a list of "known issues" regarding the structural integrity of the Plant. These issues, known to Plaintiff Board, included "[r]ust streaks down the walls from leaking penetrations and cracks in concrete tank walls." Plaintiff Board noted the significance of this known issue: "rust streaks are symptomatic of rusting reinforcing rods within concrete with associated deterioration of tank integrity/strength; one penetration with what appears to be a defective flange and/or leaking gasket."

53.     Plaintiff Board also noted "numerous cracks and leaks in concrete cell walls" and a "leaking concrete joint between C cell 1, C cell 2, and BAF Control Building." Plaintiff Board commented on the persistence of leaks in the Plant's cell walls, and surmised that such leaks were, among other things, design issues that they needed to address, stating the following:

> Project employees have continued to notice leaks between the concrete cell walls of C-Cells 2C, 3C, and 4C. Some of these leaks are at corner joints/seams. Additionally, if a maintenance emergency affecting one cell arose, it would not be possible to shut-down and drain only the one cell requiring maintenance attention if liquid from adjacent cells would infiltrate it. Because most of these leaks were identified by Project employees at startup and called to the attention of the Construction Manager and Lead Agency, the Board believes the leaks remain design, contract compliance, and/or warranty issues for the Owners to pursue having addressed.

54.     As used in the 2008 and 2009 Annual Reports of the Proceedings of Plaintiff Board, the term "Owners" refers to Plaintiff Binghamton and Plaintiff Johnson City.

55.     In 2008, Plaintiff Board also noted several design failures on the exterior of the cell walls and stated its concern about a future failure of those walls should its 2008 findings remain unfixed:

> Smaller cracks and leaks also have appeared on the outsides of several tank cell walls. Though not substantial at present, these leaks may need to be addressed on a maintenance basis in order to protect the structural integrity of the tank cell walls themselves (in other words, so as to minimize corrosion damage to steel reinforcing bars and mesh embedded in the concrete).

56.     In 2008, Plaintiff Board also commented that leaks in structural concrete between cells C-2, C-3, and C-4 still need to be repaired, and noted several other concrete wall leaks were also noted.

57. Plaintiff Board's 2009 Annual Report reiterated the following ongoing design and construction problems that it observed verbatim from its 2008 report: "Rust streaks down the walls from leaking penetrations and cracks in concrete tank walls" was stated and described in the same manner that it was described in 2008.

58. In 2009, Plaintiff Board identified leaks through the structural BAF Cell Tank Walls in the same manner as it did in 2008 as stated above Paragraph 52 of this Statement of Material Facts.

59. In 2009, Plaintiff Board cited "numerous cracks and leaks in concrete cell walls including leak from Clearwell onto area near Primary Settling Tank #10, west cell walls onto grass and concrete, and joint between Clearwell, C cell 5, and C cell 6" as ongoing problems at the Plant.

60. In mid-March 2009, Plaintiff Board observed leakage outside the west Clearwell Channel Wall, and determined that the leakage was caused by a defective seal in the concrete.

61. In its 2009 Annual Report, under the topic heading "Status unknown/questioned," Plaintiff Board cited its ongoing problems with concrete leaks near electrical panels and on the outside of brick wall facing Old Vestal Road.

## II. GOVERNING LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, "[the

moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party." *Anderson*, 477 U.S. at 248. As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) (citation omitted). As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that nonmoving party is proceeding *pro se*.[2] (This is because the Court extends special solicitude

---

[2]    *Cusamano v. Sobek*, 604 F. Supp.2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

to the *pro se* litigant largely by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[3]  As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigants must obey a district court's procedural rules.[4]

Of course, when a non-movant has failed to respond to a movant's motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically."  *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the movant's motion, and (2) assure itself that, based on those *undisputed* material facts, the law indeed warrants judgment for the movant.  *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).  What the non-movant's failure to respond to the movant's motion does is lighten the movant's burden on its motion.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to be admitted, to the extent that those facts are supported by evidence in the record, where the nonmoving party has willfully failed to properly respond to that statement.[5]

---

[3]     *Cusamano*, 604 F. Supp.2d at 426 & n.3 (citing cases).

[4]     *Cusamano*, 604 F. Supp.2d at 426-27 & n.4 (citing cases).

[5]     Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[6] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant's burden with regard to that argument is lightened, such that, in order to succeed on that argument, the movant need only show that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III. ANALYSIS

### A. Plaintiffs' Motion

After carefully considering the matter, the Court denies Plaintiffs' motion for each of the reasons stated in Defendant's opposition memorandum of law. *See, supra,* Part I.B.2. of this Decision and Order. To those reasons, the Court adds five points.

---

[6]      *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

First, while Defendant did not formally move to strike the expert report and potential testimony of Mr. Nielander, it did expressly challenge his qualifications and both the reliability and relevance of the report and potential testimony under *Daubert* and *Kumho Tire*. (Dkt. No. 56, at 10 [attaching page "8" to Def.'s Opp'n Memo. of Law].) Furthermore, Plaintiffs availed themselves of an opportunity to reply to that challenge. (Dkt. No. 59, at 5-6 [attaching pages "1" and "2" of Plfs.' Reply Memo. of Law].) In any event, the Court's conclusions would remain the same even if it were to consider the expert report and potential testimony of Mr. Nielander.

Second, the Court rejects Plaintiffs' argument that, in Paragraph 37 of its Rule 7.1 Response, Defendant admits that "collapse" is not an excluded cause of loss under the Policy. As an initial matter, Plaintiffs appear to be relying on Paragraph *39* of that Response. (*Compare* Dkt. No. 47, Attach. 2, at ¶ 39 [Plfs.' Rule 7.1 Statement, asserting, "The Policy does not include an exclusion for collapse"] *with* Dkt. No. 56, Attach. 1, at ¶ 39 [Def.'s Rule 7.1 Response, admitting the assertion in part, but stating "the policy contains other exclusions that vitiate coverage under the property coverage part for the claimed loss"].) Moreover, in supporting its assertion that "[t]he Policy does not include an exclusion for collapse," Plaintiffs rely on Exhibit A to the Aingworth Affidavit and Exhibit D to the Barriere Affidavit. (Dkt. No. 47, Attach. 2, at ¶ 39 [Plfs.' Rule 7.1 Statement].) However, those exhibits do not support the fact asserted, but only that portion of the fact asserting that the Policy does not *contain an exclusion labeled "Collapse."* (*Id*.) *See also, supra,* Paragraph 38 of Part I.B.3. of this Decision and Order.

Third, as to the Faulty Design and Workmanship Exclusion, Plaintiffs are mistaken that (based on the record presented on their motion) no rational fact-finder could conclude that Defendant has not met its burden with regard to showing that the losses and damages sought

under the Policy resulted from faulty design, workmanship and/or material.  Setting aside Plaintiffs' allegations in their 2012 state court complaint, the following evidence could rationally support such a conclusion: (1) the 2008 and 2009 annual meeting reports issued by Plaintiff Board; (2) the 2011 report of Edgar Eslinger, P.E. of EFI Global; (3) the 2011 LMK engineering report commissioned by Plaintiffs; (4) the 2012 affidavit of Catherine Aingworth in the related state court action; and (5) the 2013 report of Plaintiffs' expert, Dr. Paul Carr.  Because of this evidence, the Court finds that the current case is distinguishable from those cited by Plaintiffs for the proposition that, "in order for Defendant to satisfy its burden and demonstrate that the design and/or construction was defective and, therefore, that the defective design or workmanship exclusions apply, it must submit expert testimony."  (Dkt. No. 59, at 10 [attaching page "6" of Plfs.' Reply Memo. of Law].)  The Court notes that, in addition, two of the four cases cited by Plaintiffs are negligence or architectural malpractice cases, in which one of the issues was whether the engineer or architect deviated from accepted industry standards (which is not an issue in this case).  (*Id.*)

Fourth, as to the Resulting Loss Exception, even if the Court were inclined to construe "collapse" as a cause instead of an effect, that construction would not appear to enure to Plaintiffs' benefit, because (pursuant to the exception) the collapse would still have to be "not otherwise excluded by this coverage part."  However, based on the record presented on Plaintiffs' motion, a rational fact-finder could conclude that Defendant has met its burden with regard to showing that the collapse fails to meet that requirement, given the above-described record evidence that the collapse was caused by faulty design and workmanship of the wall.

The Court pauses to note that, by arguing that the collapse was not caused by faulty design and workmanship but by "the operation of the subject tanks, and their subjection to operating forces and varying loads and forces,"[7] Plaintiffs appear to be essentially relying on the effect of gravity over time on the "loads" inside the tanks,[8] and treating the force of gravity over time as analogous to fire, wind, snow, and falling trees. However, unlike fire, wind, snow and falling trees (which are not omnipresent in the world), the force of gravity over time is omnipresent in the world. As a result, relying on it as the cause of the collapse would appear to broaden the Resulting Loss Exception so that it nearly swallows the Faulty Design and Workmanship Exclusion. Moreover, to the extent the "forces" referenced by Dr. Carr included non-gravitational forces (such as friction, etc.), such forces are admittedly the result of the tanks' "operation" (the act of which was the purpose of the tank's design and construction). As a result, concluding that it was not faulty design and workmanship that caused the collapse but operating forces is like concluding that it was not a faulty fan belt that caused an automobile engine to overheat but the driver's act of turning on the ignition. Simply stated, it is nonsensical under the Policy.

----

[7]    (Dkt. No. 59, at 8 [attaching page "4" of Plfs.' Reply Memo. of Law].)

[8]    (Dkt. No. 54, Attach. 4, at 4 [Ex. B to Aingworth Affid., attaching expert report of Dr. Paul Carr, stating, in pertinent part, as follows: "Once in operation the tanks were subjected to the 'normal' operating forces, which is a series of varying loads and forces. These loads are dynamic, and are reflected from the actual operating sequences of sewage treatment and filter backwash. Overtime, the dynamic loads of these processes led to overstress and the eventual failure and collapse of the west wall of the C-Cell filters"].) For the sake of brevity, the Court will not longer on the fact that the expert report of Dr. Paul Carr was relied on by Plaintiffs in their reply on their own motion for summary judgment but not included by them in only their response to *Defendants'* motion for summary judgment. The Court will also not linger on the fact that, in his one-page report, Dr. Carr does not expressly differentiate between the "basic engineering errors in the design" of the tanks (combined with "deviations made to the designs" during construction) and the "'normal' operating forces" to which the tanks were subjected in the "operational phase" of his investigation. (*Id.*)

Fifth, even setting aside the above-described facts, Plaintiffs are mistaken that (based on the record presented on their motion) Defendant would need *expert testimony* to prove to a jury that Plaintiffs' loss or damage has not occurred in "connection with any [of the] cause[s] of loss" referenced in the Resulting Loss Exception. While such testimony could be helpful in separating the different strands of cause and effect that Plaintiffs claim exist, it would not be necessary, given the above-described record evidence. For this reason, the Court finds that the current case is distinguishable from those cited by Plaintiffs in their memorandum of law. *See Montefiore Med. Ctr. v. Am. Protection Ins. Co.*, 226 F. Supp.2d 470, 477-78 (S.D.N.Y. 2002) (finding that defendant created a genuine dispute of material fact where it relied on its own expert's report as well as plaintiff's engineering report); *J & S Commercial Constr., Inc. v. Cook*, 26 Misc.3d 1221, 1221 (N.Y. Sup. Ct., Oneida Cnty. 2010) (granting third-party defendant's motion for summary judgment where third-party plaintiff "submitted no proof" in opposition to the motion, including "no expert affidavit or expert report whatsoever").

**B.     Defendant's Motion**

After carefully considering the matter, the Court denies Defendant's motion generally for the reasons stated in Plaintiffs' opposition memorandum of law. *See, supra,* Part III.C.2. of this Decision and Order. To those reasons, the Court would add only the following analysis.

Plaintiffs' expert, Dr. Paul Carr, has concluded that it was the operation of the subject tanks and specifically their subjection to "operating forces" (consisting of "a series of varying [dynamic] loads and forces") that proximately caused overstress to, and the eventual failure and collapse of, the west wall. (Dkt. No. 54, Attach. 4, at 4 [Report of Dr. Paul Carr].) While it is not entirely clear to the Court what these "operating forces" were (presumably the movement of

wastewater and filter material within the cells), and how (if at all) they differed from usual

operating forces, the Court is reluctant to conclude that Dr. Carr's trial testimony could not

constitute sufficient evidence upon which a rational jury could render a verdict for Plaintiffs.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' motion for summary judgment (Dkt. No. 47) is **DENIED**;

and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 49) is **DENIED**.

**ORDERED** that counsel are directed to appear on **JULY 7, 2015** at 11:00 a.m. in

chambers for a pretrial conference, at which counsel are directed to appear with settlement

authority, and in the event that the case does not settle, trial will be scheduled at that time.

Plaintiff is further directed to forward a written settlement demand to defendants no later than

**JUNE 10, 2015**, and the parties are directed to engage in meaningful settlement negotiations

prior to the conference. In the event that counsel feel settlement is unlikely, counsel may request

to participate via telephone conference for the limited purpose of scheduling a trial date by

electronically filing a letter request at least one week prior to the scheduled conference.

Dated: May 13, 2015
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge